Commissioners Mr. Street I place the court at Arendt Street on behalf of the petitioners. The thalates rule should be vacated for three independent reasons. First, the Commission failed to follow the Rules and Procedures for Banning Second, the Commission arbitrarily shifted the goalposts in the middle of the game when new scientific data eliminated the basis for regulating these thalates. And it did so by looking at actual women in the data set, in direct contradiction to the Commission's own recognition that the spot-sample-based HI could only be used to look at population estimates, not individual exposure. And third, the Commission failed to give notice and an opportunity to comment on this new actual women rationale that only appeared in the final rule. Mr. Street, let me turn you to the issue of standing first. You filed a supplemental statement that ExxonMobil produces DINP and DIDP, the only one of which is even involved in this case. Why would the association through Exxon have the right to challenge any part of this rule that doesn't affect a product that they make? So there's really one aspect to this rule, which is banning hazardous products. And it's banning all child care products and toys that contain DINP and then four additional thalates. So we have the ability to challenge the rule, which is a unitary body, as to all of the thalates. We also have deck... Back up. Why is that? I mean, what I'm looking at is for organizational standing, you need, you know where I'm headed with that, and you haven't indicated to us that any component of any of these organizations, any member of any of these organizations, manufactures anything other than one form of thalate. So why, in that statement you gave me, maybe too fast for me to follow, why is that, why can you challenge the whole rule as a result of one form of thalate? So let me back up and try to answer that again. Go slowly for me. First of all, I believe that our declarations, setting aside the ExxonMobil declarations,  all of the thalates, or regulated thalates, is what the declarations say. I believe that's sufficiently on its own. But let me say that what we are challenging here is really two components to the rule, right? There's the interim ban, which banned DINP, and then there are the four added thalates. But the interim ban was expanded as to DINP as well, because it expanded DINP to cover all toys and all child care products. So we have standing by virtue of making DINP to challenge both the expansion of the rule and the continuation of the narrower ban on DINP as to mouthable products. And finally, I'll make one quick further point on standing, which is that the ExxonMobil declaration sets out that because the rule bans these thalates, they're all banned for the same reason, on the theory that they are presenting a risk to women's health and infants' health, that that creates a market stigma that would drive down demand for these products. And I would add only briefly on the note of jurisdiction, separate and apart from standing, that there can really be no doubt that this Court has jurisdiction because this is a rule banning hazardous products, and rules banning hazardous products are one of the consumer product safety rules that are directly reviewable by the Court of Appeals. I'm certainly happy to address any other questions on standing, but with that I would turn to the merits. All the actions taken are bans on hazardous products implicating 2057, correct? Yes, yes. This rule as a whole is a ban on a hazardous product, no matter how you look at it. Congress set before the Commission a task, which was to identify which thalates and which thalate products should be banned. As one aspect of that, they look at the interim ban. Congress wanted to be sure they did that, but they also look at all of the thalates as a whole in consideration of the CHAPS report. And that's exactly what the Commission failed to do here, is they failed to do what Congress directed them to do, which was to declare any risky thalates a hazardous product under Section 2057. And what the Commission did, it didn't even address that statutory language in its rule. It simply declared, we are not going to follow the 2057 procedures. We're going to only follow the thalate-specific procedures. And what the Commission does in its brief, when it does attempt to come up with the rationale for that interpretation, is it reads the whole declare banned hazardous products clause out of the statute. The statute would mean exactly the same thing if that were redacted from the statute under the Commission's interpretation. There can't be any deference to an interpretation that's not included in the rule. But if the 2057C is specific as to this and it is health-based only, why wouldn't that trump the more general provisions that you say require the Commission to consider cost? I disagree with the premise of that question because 2057CB3 contains a unitary authorization to the Commission to regulate. And it says it's all one clause. It says they're supposed to consider the CHAPS report and declare any thalates banned hazardous products under Section 2057 as necessary to protect the health of children. But Congress gave them one sentence and it said the ultimate standard is X, but you look at 2057, which is the way you always declare bans on hazardous products for the procedures and other requirements to go through. Now, if the Commission thought there was some conflict or some tension between those different sets of requirements, I don't think one's general and one's specific. They're both in the statute together. They perhaps could have gone through and tried to say, well, here's a conflict, we're not going to follow this. But otherwise the Commission had to follow Congress's expressed direction. Mr. Street, it seems to me there are inconsistencies potentially between the amendment that was made in 2008 or whatever the year was and the general language that you're relying on, including the first part of the subpart that you talked about earlier. And the standard here is to ensure a reasonable certainty of no harm to children, adequate margin of safety, which is a heck of a standard. And I don't know how well that fits with the general banning of products under 2058 or 2057 as it gets you then to the procedure. I just don't see the cost-benefit and other options as being really fit within that sort of standard. And it does seem to be a reasonable interpretation of the rule, of the statute, that this is a freestanding phthalate provision. To the extent there is any particular conflict in the standard that is set out in 2057C and the more general product liability or product consumer safety standards in 2057 through 2058, the Commission can look at that and can determine that it's going to follow 2057C. But much of what is included in the banning hazardous products section of the statute are simply procedural mechanisms that the Commission has to do, due diligence that it has to do, for example, determining whether these products are even distributed in commerce, determining whether there are alternatives to the rule, determining who's going to bear the costs and benefits of the rule, separate and apart from even the costs and benefits. But I want to go directly to the premise of the question, which is that in some way health standards and these specific requirements in 2057 and 2058 are necessarily in conflict. Because in Michigan v. EPA, the Supreme Court looked at a similar statute that imposed a very high health space standard for regulating on the EPA. And yet the Supreme Court said that the EPA had to take into consideration costs or benefits as well. And moreover, Congress knows how to direct agencies to ignore costs and benefits when regulating sensitive chemicals. In the Toxic Substances Control Act, which we cite in our reply brief, Congress directed that agency to apply a health-based standard and then said do not take into account costs and benefits. If you do have standing, but if you're wrong that they messed up on the rulemaking, your second and third arguments still apply. Yes. Yes. So let me turn to those. And I would say if the Court rules for us on the statutory argument and vacates the rule on that basis, it doesn't need to reach the second and third arguments. But if it rules against us on that, then it would need to. So our second argument is that the commission changed the regulatory threshold when the new data came in and didn't support regulation. And let me unpack a little bit what I mean by that. At page 49, 955 of the final rule, the commission explained that it could look at spot samples to determine whether the hazard index was greater than one only because it was going to derive population-wide exposure estimates from those spot samples. They were going to be spread out across the whole set and you could derive something from it. But they expressly said on that page, you cannot look at these spot sample-based HIs to derive individual exposure estimates. When the new data came in, the commission did exactly what it said it would not do. It looked at actual women in the data set and determined if they had HI greater than one and based the regulation on that. It looked at those women, individual exposure. Well, they did determine that, two of nine, but they didn't base the regulation on that. I thought they specifically responded to the comment and said, sure, food may have given most of the hazard as to these spot samples because that's usually what's going to happen. But that's not what we're doing. We're not saying these women had leached plastic that caused this. Instead, we did many over two years, different times, different places, and from that we can extrapolate that 1% of women of reproductive age had this unacceptably high exposure. I disagree with that on a very fundamental level, Your Honor. We do not disagree with the point about the food and other sources coming into it. We're not disputing for these purposes that that's properly considered. What we do dispute is the very last part of what you said, which is that the commission derived from the presence of actual women in the data set that 1% of the population had dangerous or risky exposure levels. In fact, the commission expressly disclaimed making any such inference because it said numbers that are above the 99th percentile are unstable and unreliable for the purpose of drawing any population-wide estimates. So what they did was a shell game. They started out by saying we use spot sample-based HIs only to look at population-wide estimates, not individual exposures. I'm not a statistician, but it may be hard for them to extrapolate 20,000, 50,000, 500,000, but they're still saying two to five out of 500, and that's a significant amount when we've been told by Congress to reduce any reasonable certainty of harm with a margin of safety. I understand the question. Let me try to address it in this way. At page 49, 961 of the final rule, they say that these numbers are statistically unstable and you cannot draw population-wide inferences. They say on 49, 958, the national population projection for HI greater than 1 is not estimable. Now, I understand what you're saying, which is, well, then couldn't they still say that that means somebody was harmed somewhere out there? But the problem is, no, because they've already disclaimed using spot samples to derive any particular individual person being harmed. What's the accepted scientific methodology here? When you're looking at using spot samples? Is it in the record? Yes, I think the commission and the CHAP used 95th percentile consistently until it didn't suit the data, and that's at 49, 446. Well, what do you mean it didn't suit the data? Because they had an obligation. Congress says do this in 2008. Then the preliminary rule is what? 2014. The commission had to update with all relevant data if the final rule is in 2017, and somewhere in there they actually now lift the ban as to two. So they're looking at data and they're giving it to you when it benefits your viewpoint, but they're also saying the exposure hasn't gotten sufficiently reduced given what Congress has told us to do. I want to know what the scientist said. As a scientist, independent, we do it this way and not this way. Yes, if you're looking at using spot samples in this way to determine that a particular percentage of the population is at risk, you would have to look at that at the 95th percentile, and the commission itself describes that as the upper bound at page 78, 332 and at 78, 328. Now, you cannot look at a spot sample. Is that answering her question? That's just saying at some point 95% was what we need to protect against, not 5% more. That's a debate about are we being too conservative or not. But where's the debate about this is non-scientific data? And the 95th percentile, they can draw a national population inference, which is what the commission said is the only thing that you can do with spot samples based HIs. Once you get up to the 99th percentile, the commission itself says, at the page I've already cited, you cannot draw national population-wide inferences. All you know is that one person had a spot sample at one particular point in time, or two through nine. Now, why can't you derive anything about that? Because the HI metric is set to measure the dangerous level or the risky level of long-term exposure. So if you have two to nine women in the record that have HI greater than one based on a spot sample, all you know is that they had an HI spot sample level that's 100 times lower than the long-term exposure level that caused a risk in rats. So you can't even draw any conclusion as to those particular people. But the commission scientifically did say that spot samples can under-predict exposure, and I think the commission also said that you don't need long-term exposure to cause adverse health consequences. Two points there in response to that two-part question. So the commission did look at they did say there could be over-prediction and under-prediction, but it's basing the regulation on the spikes upward. So it doesn't really matter that there's under-prediction. That's why the commission said if you look at spot samples over an entire population, it will give us something we can work with, but only if it's at a statistically stable level. Once you go to the 99th percentile, now you're looking at outliers who may have just... Is there anybody who's an expert in this field that's not associated with the party who said, here's the methodology that's accepted, this is the way we measure these things? I think you have to look at the commission taking the commission's word for it, which is when you're dealing with these one-time spot samples, the only thing you can use that data for is to derive national exposure estimates. You cannot use one-time spot samples to determine that a particular individual is at risk. So arguably they did it the right way when they looked at the national population sample at a 95th percentile and they said we can derive from that that there's some level of women in the population that have an HI greater than 1. But when the data came in that showed now at the 99th percentile, there's nobody that has an HI greater than 1. You have to look beyond the 99th. Then they switched their rationale and they say, oh, we're not looking at national population projections anymore. We are now just looking at those actual women. But that's the exact thing the commission said you cannot do because it looks at spikes and it looks at things that don't amount to a long-term harm. And so my focus is really on the commission's internally contradictory rationale as well as on the fact that once you get looking at actual women in spot samples and that's all you have, you have no rational basis for determining that anyone is even at risk in this data set. And, Your Honor, if I could just take a minute or two on the notice and comment or I can come back on the rebuttal on that point. Take a minute so that you're fully opened and we'll give the other side a couple extra minutes. Very good. So regardless of what you think of the internally inconsistent rationales, the commission did not give notice of its actual women rationale or allow an opportunity to comment on that. It didn't bring that up until the final rule. And the best evidence of that is all you see in the CHAP and all you see in the notice of proposed rulemaking is 95th, which again was consistent with the national population projection. Then the new data comes in and you have the staff reanalyzing the data. But all they do is they just report on the data. They do report on actual women in 99th percentile, but they say these numbers are unstable. The commission never comes in at that point and says, as the commission we are giving you an indication that now that's our threshold for regulating. Even though we said we're not going to look at individual exposures, they never came forward and gave that notice and comment opportunity so that we could make the arguments that we're having to make to this Court this morning about the contradictory nature of the rationale. And I think the best evidence of this is the dissenting commissioner's statement, which in my experience is quite unusual. And he says the rule differs so significantly from the proposed rule in the fundamental basis, scientific rationale, and technical justification that I could not have seen this coming, nor could anyone else really. It's pretty remarkable that a commissioner is saying that. Did Merkel also echo that or is that just how do you pronounce his name, Mohorovic? Mohorovic. Merkel echoed the same issue with going to actual women and looking at spot samples and the contradictions that that created. Would you add three minutes to each of these? Sorry? Three? May it please the Court. Joshua Reves for the Consumer Product Safety Commission. In 2008, Congress enacted a permanent ban on children's toys and child care products containing three phthalates and gave the commission very specific instructions for how to further regulate phthalates. Nine years later, after a peer-reviewed advisory panel of independent scientists confirmed that phthalates cause serious health defects, most acutely to the male reproductive system, the commission promulgated the final rule challenged today. That rule slightly expands Congress's interim ban as to one phthalate. It lifts Congress's ban as to two additional phthalates, and it further regulates as to four other phthalates. That rule is consistent with the phthalate statute and the Administrative Procedure Act as it reflects careful and rational consideration. In your motion to dismiss on jurisdiction, you said it's not a ban. It's not a rule banning hazardous products within the meaning of the Consumer Product Safety Act, within the meaning of 2052A6. But the effect of the rule is that certain toys containing too many phthalates are banned. That's consistent with the phthalate statute's instructions, and whether that's enough for jurisdiction is a different question than what the rule actually does. So I'm happy to address the jurisdictional issues or to proceed directly to the merits if the Court has assured itself of its own jurisdiction. Kennedy. I want to respond to the inquiry I had with Mr. Street on jurisdiction. The standing question, Your Honor? On the standing, yes. So we're not contesting Petitioner's standing. I think you asked a good question as to whether they have standing to challenge Nice of you to say, but you don't think that's relevant in what we're looking at? I'm not sure if they have standing to challenge the four chemicals that are not DINP. And I don't think they're right that this is one indivisible rule. The Supreme Court in the Kmart Cork case, I can give you a citation for that, said that you can sever rules just as you can sever statutes by looking at the intent of the rulemaking. Is this the only challenge to this rule? This is the only challenge to this rule. There is a limitation of 60 days to bring a challenge. So if they can't challenge it, it's too late for anybody else to challenge it? I believe that's correct, Your Honor. All right. Why don't I proceed to the statutory meaning question, the question of what 2057 subsection B3b means in this rulemaking. And our position is not that declared to be a banned hazardous product under section 8 is superfluous. Rather, we think that is telling, that Congress was telling the Commission what the effects of its declaration would be. There are other parts of the Consumer Product Safety Act that use banned hazardous product. For example, 15 U.S.C. 2063, which says that all banned hazardous products have to be subject to third-party safety testing. And Congress meant that once the Commission promulgated a phthalates rule, that rule would have the same effect as a rule promulgated under 2057 and 2058. Now, there are good structural, textual, and purposeful reasons why Congress would not have intended the Commission to go through 2057 and 2058 as well as the phthalates statute. Let me start with the textual reasons. There's the rule of last antecedent under which under section 8 is most naturally read to modify the words banned hazardous product, not the word declare. There's also the deeming language in that statute deemed to be a banned hazardous product. And I would point the Court to sections 2057a and 2057b. I'm not talking about the subsections of 2057. I'm talking about standalone provisions with the letter at the end, which say butyl nitrate shall be considered a banned hazardous product under section 2057 of this title, and 2057b says the same for a different chemical. So Congress had previously used this 2b language not to empower the Commission to make rules, but just to say this is a banned hazardous product under section 7, excuse me, under section 2057, and it makes sense that in enacting 2057c, Congress would have looked at 2057a and 2057b for guidance. There's also, as several of you noted, the structural incongruities between the phthalate statute and 2057 and 2058. The phthalate statute in the necessary to protect the health of the children language creates a health-based standard that the Supreme Court in the Whitman case said precludes consideration of costs. By contrast, 2058 in F1 and F3 requires consideration of costs. There's also the procedural incongruity. The phthalate statute has to comply with the APA, whereas 2057 and 2058 have to go through oral presentation requirements above and beyond the APA. So the question is why would Congress in enacting the phthalate statute have created those sorts of incongruities, given that its purpose, and I think just looking at the very specific directions that it gave to the CHAP reveals that its purpose was solely to protect the health of children and pregnant women. At the very least, I think that our position on the statutory meaning is a reasonable one entitled the Chevron deference. And I do just want to note that the Commission understood that some people wanted to follow 2057 and 58, and JA 2093 explained that it was not required to do so. So this is not something that was sprung in this litigation. Unless there are further questions on the meaning of the statute, I thought I would turn to the various arbitrary and capricious claims. And I think it would be helpful for that to disaggregate the science into kind of three buckets. The first question is, do phthalates cause harm above a certain level? And that's a question that the peer-reviewed advisory panel answered in the affirmative. It found that phthalates cause genital malformation, can cause infertility, can cause all kinds of bad things. And looking at the scientifically accepted metric in the field, the hazard index, created a level above which they decided that it wasn't safe. Now, Petitioners have several objections to that, to the decision to use an interspecies risk factor, an intraspecies risk factor. And I'm happy to talk about any of those. But the commission carefully went through those in the final rule and explained why each of those was not only supported by the science, but was also consistent with what other agencies and private scientists have done in facing similar challenges. The second question is, once we know that phthalates are unsafe above a certain level, how many people are above that level? And for that, the commission looked at two data sets, one of women and one of infants under six. And when the advisory panel looked at that data, it found that 10% of women, 10% of children, had phthalates above the level that was safe. Now, subsequently, there was new data. The commission updated that data. Wait. When the advisory panel looked at it, but they were using the pregnant women, right, not the women of reproductive age? They were using pregnant women for the end. They found 10%. Ten percent. Yes. That's on JA615 in the third column. Okay. So you're getting to the amalgam of arguments that he really pressed us today, which is, okay, but something happens between CHAP, advisory, and final, and all of a sudden, the commission acknowledges there's much less exposure out there, but they don't reduce the recommended rules at all, correspondingly. That's correct, Your Honor. And that's because the commission always had the same methodology, that it was necessary to make sure that no one was above the hazard index, that no one had too many phthalates in their system. No one. Okay. Even if it were one out of 538? As long as the data showed that people had too many phthalates in their system, I think that regulating could have been necessary to protect the health of children, or at the very least, that it would have been reasonable within the meaning of the Administrative Agency Directive. Okay. So, I mean, you're eloquent, and you stick to your outline, but he does say that the commission itself said at that earlier point, you needed 5%, or else it's just outliers, nothing can be scientifically unstable. And there's nowhere in the proposed rule where they say we're relying on the 95th percentile. And, indeed, it would have been strange for them to do so, because they use the language up to 5% of infants, which is below the 95th percentile. So I've looked through the proposed rule many times, and I just can't find anywhere that they say that. Now, it's true that we get to the women of reproductive stage data that the commission looks at. That's correct. And take it from there, in terms of his critique, that the spot sampling isn't really telling us anything about long-term exposure to plastics. So in each NHANES data that the commission reviews, there are women with too many phthalates in their systems. And it's true that that uses spot sampling. The scientific norm in this field, Judge Owen, is to use spot sampling. There's no data set. Well, the commission didn't explain that. That's my problem. They say, on the one hand, we will not use spot sampling to determine how many women actually have it. And then they say we're going to use the same data spot sampling to determine women who actually have it. And they did not explain why it was okay to change that rationale. If there were some explanation that there isn't, is there? I think there's an explanation to JA-2104 and JA-2109. Wait. Slow down. JA what? 2104 and 2109, both times in the middle column, where the commission explains that even a few doses or even one dose of phthalates above the hazard index can cause serious harm to fetuses. And I think that provides a rational basis for the commission to have looked at the spot sampling data. How does that fit in with the data that we've already been talking about? And Mr. Street, as my colleague has suggested, has really tried to focus on. It's one thing to say the individual women, eight or however many there was, were not relevant for some sort of percentage analysis. Are you saying that that statement on those two pages is an indication of the fact that there may be one woman is enough to, whether you want to use this word here or not, ban these particular phthalates? Is that what it's relying on, that some women in the spot samples may have had some exposure? Is that the data? Or what data do those two statements on those two pages rely on? No, that's the data. The data that's relied on is the spot sampling data. But they don't explain why they say, here's the methodology. We can't use the methodology this way. And then they use the methodology that way. And they don't explain why they can now use that methodology. So I think what the commission was saying it couldn't use is something different. I think that they were saying that they were saying that they were saying it couldn't use is something different. And did it explain why and how it's scientifically valid now when it wasn't before? So I don't think they ever said that it wasn't valid before, Your Honor. I think maybe that's where we've been talking about here. The commission said that above the 95th percentile, you couldn't give a number in the broader population. Or rather, you could. I mean, the law of multiplication would still work. But the variance would be too high to do it responsibly. So we can't say with this data, oh, 600,000 women of reproductive age are overexposed, or 400,000 women of reproductive age are overexposed. What we can say is there were women in each data set. And in the one data set with infants, there were also infants in this data set that had phthalates above the level that was safe. And that's what provides a rational basis for the commission's rule. And unless there are further questions. Oh, yes. No, there are. But what about his final point, that even if that explanation is at the record sites you've given us and is the convincing one, was there a denied opportunity to comment on this whole new women of reproductive age data set? So I was just going to turn to the logical outgrowth part. We don't think there's a logical outgrowth problem with this case for a couple of reasons. There's not a logical outgrowth problem? Excuse me, a logical outgrowth problem, a notice-and-comment problem. Oh, okay. The first is that the final rule is identical in substance to the proposed rule. It bans the same things. And they don't have an APA case that says, well, if the reasoning changes, that can be a notice-and-comment problem. The only case they give us is this corrosion-proof fittings case that's not an APA case at all. It's a case under a statute that requires cross-examination requirements. And this court at Penn Site 1211 explained why those requirements were what was violated in corrosion-proof fittings. They do rely on the D.C. Circuit case about low-confidence data. And wouldn't they be saying the rule that was promulgated was promulgated based on low-confidence data? The D.C. Circuit and Sierra Club used low-confidence because the agency alleged the data was, quote, incomplete and, quote, subject to change, quote. So because the agency there wouldn't stand by its data, the D.C. Circuit has to rely on it. Here, we're not saying the data is subject to change. We're not saying that it's incomplete. All we're saying is that it's inappropriate to kind of do multiplication to give a full number of women in the population. And that might well have been a problem if the statute had said something like, if more than 150,000 women are in danger, you should regulate. But that's not at all what the statute said. And at the very least, the commission reasonably interpreted the statute to allow regulation whenever there were women in the data set. And again, in every data set, in every data set they looked at who were overexposed if that's true. We were to say this is unreliable, extrapolating from spot sample data. If you say it's so common and present used, would that cause havoc in a lot of areas or not? Yeah. I think other agencies also use this NHANES data, the National Health and Nutrition Examination Survey data. I think that's the best data for determining all sorts of things. And they just can't use exposure data because that would be — Why shouldn't we send this back and let the commission explain it and let, instead of their lawyers, publicly, so the courts can have something to review? Well, I think the commission did explain all of these points. And I can certainly give you more JA sites if that would be helpful. But I think the commission's final rule carefully went through all of the objections. Does the final rule depend on the spot sample data, or was there epidemiological data also that showed unacceptably high levels of exposure? Or does it turn and fall on the reliability of the extrapolations from spot sample? All of the epidemiological data is spot sampling data. And that's true not just for this rule, but for everything. The NHANES data is all spot sampling. The SFF data of infants is all spot sampling. And the alternative to spot sampling is to keep people in a lab for weeks and to kind of measure their urine every time. And that's so much more expensive than just capturing people once that it makes sense that — I'm certainly not aware, and I don't think Petitioners have suggested it. Spots sampled data extrapolations are valid. And the argument they're making here is that the data points were outliers. There were just too few of them. And is your answer a statutory one, that no, the statute says get rid of almost all risk, not 100 percent, but almost all? Or is your answer, no, this is really common to extrapolate from 2 to 8 out of 500? Now, our answer is a statutory one. Our answer is once you determine that there are women with too many phthalates in their system, how many women do there have to be in order to justify a ban? It's really a policy question. It's really not a scientific question. And it's a policy question that Congress entrusted to the Commission with highly protective language not to Petitioners or to regulated industry groups. Roberts. But two of five dissented strongly on this exact topic. It's true. It's not just a legalistic argument. No, certainly. And one of the reasons that Congress creates multimember commissions is so that there can be robust disagreement. And in this case, as in other cases with all sorts of multimember commissions, Commissioners aired their disagreement. But the majority of Commissioners disagreed with that. And the question before this Court is whether that disagreement was rational. Yeah. So maybe I could just say one other thing about the logical outgrowth claims in this case, which is that the Commission, I think forthrightly, made all of the new data available for notice and comment every time it did the new data analysis. And there were comments, including by Petitioners, including by ExxonMobil, the only kind of named Petitioner who sought to demonstrate standing in this case, objecting to exactly what the Commission did. And I did notice that. The industry data was not made publicly available? What do you mean by the industry data? Well, I thought I read that the Commission said we couldn't use the industry data because they aren't making it all publicly available. At various points, industry suggested that their scientists found less risk of phthalates. But yes, the Commission couldn't use that data because it was not publicly available. And at what point did they lift the ban on two? That would seem to me to play into how rational it was, that they were actually saying, well, now we're going to actually lighten and allow industry to produce some, but not these. Did that happen between the promulgated rule and the final, or was that the CHAP recommendation? That was the CHAP recommendation. It was in the proposed rule also. And if you look at JA 1530, Exxon notes that the updated data, quote, appears to be pointing to exactly the choice the Commission ultimately made, to look above the 95th percentile at women who are actually affected. At JA 1533, they say using values above the 95th percentile to justify a ban would be scientifically unsupportable, which is exactly the argument that they've made before this Court. Now, the Commission considered those, and it rejected them. It rejected them at JA 2109. It explained that there's no norm between the 95th and the 99th percentile. The question is how health protective you want to be. But certainly, they had the opportunity to press that comment before the Commission, and the Commission responded to it. The ultimate question in this part of the APA is one of fair notice. And I think if the Court looks at those JA citations, they'll see the petitioner certainly had fair notice of what the Commission was intending. So I'm happy to answer any further questions that the Court has. And if there are none, we would just ask that the petition for review be denied. Thank you. May it please the Court. Jared Nicely on behalf of the Intervenor Public Health Groups. In my time, I'm going to focus on petitioner's failure to establish standing to challenge this rule. If I have time at the end, I'll turn to some of the merits issues you've been discussing. The Court shouldn't reach those merits issues because petitioners lack standing. They have not met their burden of identifying a specific member who would have standing to bring this suit on its own. The only member that they identify with specificity is Exxon Mobil Chemical Company. So Exxon's lack of standing, as I'll describe, is dispositive here. As an initial matter, the Court should disregard petitioner's claim that Exxon is harmed by some sort of ill-defined stigma that the rule casts over thalates. Petitioners waived any stigma-based claim for standing by not presenting it until their reply brief. Petitioner's standing instead hinges on their lost market theory that they present on page two of their opening brief, that because the rule prohibits the sale of certain children's products containing certain thalates, Exxon would lose a market for its thalates. But there's no actual evidence that Exxon is harmed by an inability to sell the relevant thalates for use in children's products covered by the rule. Exxon makes and sells DINP, as we've discussed this afternoon, but that alone does not show that Exxon is likely to be harmed by the rule. The missing link here, and to establish that harm, petitioners need to provide evidence that Exxon actually wants to sell DINP for use in the children's products regulated under the rule. It sure seems to be spending a lot of money in the rule-making proceedings and the appellate process. It does, Your Honor. But notably, they never once, and if you look at their pleadings and then the one supplemental declaration filed on reply, they seem to assiduously avoid saying that they want to sell DINP for use in these products. And I think it's telling. It's not a high bar for them to say that or for them to say if it weren't for the rule, this is an area we would try to sell these products. Mr. Wallace's declaration, if you look at it, just states his vague understanding that Exxon sells DINP into the stream of commerce and where it eventually potentially could be used in relation to children's products that may or may not even be regulated under the rule. This kind of speculative claim of injury does not satisfy Article III's requirement that an injury be eminent and likely. And petitioners essentially concede this fact in their reply brief on page 4, where they argue that they don't need to show that Exxon sells phthalates that do or could end up in the products regulated under the rule. But that's exactly what they need to show to establish a lost market injury that's actually fairly traceable to the rule and not some other phthalates regulation either by Congress or by another jurisdiction in this case. And they haven't made that showing, so Exxon lacks standing to challenge the rules of DINP. Just quickly, since you prepared this issue, what's your best Fifth Circuit case on waiver, the first waiver point and the second traceability point? I think the waiver point, the best case is, it's not a published decision, but it's the Cavazos Decision 388F, Federal Appendix 398. It's a 2010 decision that says by waiting to make a standing argument on reply, you've waived that argument. When we decide not to publish an authority, it seems to have no effect. It's not binding, but the rules do say I can present it to you for your consideration. We have jurisdiction or we don't. You can't either create or waive jurisdiction. Correct. Let's move on. Okay. Well, the one additional point, and this goes to Judge Southwick. Give me your best one on traceability. Best traceability, I think, is really actually the Supreme Court decision in Lujan. All right. Okay. Just moving quickly to Judge Southwick's question initially of petitioner's counsel, that even if Exxon has standing as to the rules DINP bans because it makes and sells DINP, it clearly lacks standing to challenge the other four bans at issue in this case. There's no evidence that Exxon or any other named member of the petitioner groups actually make those other four phthalates. And the associational standing declaration that were submitted with the initial opening brief cannot provide the evidence that the specific members do anything with specificity. Is there anything in the record about the relative market share of these different forms of phthalates? I would assume some are much more used in production of children's toys and other things than others. Is that any part of ‑‑ I mean, if we allow them to proceed on the one in which ExxonMobil is involved with, is that the principle one that's in play here? Anything like that in the record? There's no direct reference, I think, to market share in children's products. But the record does reflect that only three of the five phthalates at issue were found by CPSC in testing. And two of them, the main concern was a substitution issue where if you ban certain phthalates, these phthalates would then be used in substitution for them. Just to make the quick point and respond to the petitioner's argument that you can look to the associational standing declaration submitted with the opening Supreme Court decision explicitly rejects the idea that courts can rely on association's representation of what their members do at this stage in the litigation. You need actual declarations from the members themselves describing their injury. And I'll turn briefly now to the merits if there are no further questions on standing. I want to put a fine point on petitioner's 95th percentile argument and what it would actually mean. It would mean essentially that an agency could not regulate if an activity or a product put at risk 4.9 percent of the population, no matter how grave the risk. Well, counsel, I thought the argument primarily was that when you get past 95 percent, it's not that you're not worried about the 5 percent who are exposed, it's that the data's not usable above that number. So it's not we just don't know who's being exposed once you get beyond the 95. Is that a fair assessment of their argument? I think that's a secondary or there are two parts to that argument, and I'm addressing the first part now, just that the idea that the 95th percentile serves some sort of talismanic principle and regulation has no basis in the statute. Aren't those confidence intervals? Excuse me? Aren't those confidence intervals? Isn't that what we're talking about? Confidence intervals are not necessarily set at the 95th percentile. You can set them at the 99th. Is that what this is? Is that where this was? The 95th percentile that we're talking about, was that originally the confidence interval? I don't believe that they originally referred to it as a confidence interval. They did represent what was going on at the 90th percentile and the 95th percentile for certain data sets, but they never, the CPSC, importantly, never claimed that that was the sole rationale for which they were regulating. Well, commission can change its view on things, but just to set that when it first appeared, and following up perhaps on what Judge Owen was asking, wasn't 95 percent, what the commission was initially saying, about the extent of which we feel confident that the data will help us decide what we need to do? And things change, and that may be completely appropriate or maybe not. But what was the relevance of that 95th percentile number when it was first used? The relevance, Your Honor, is it's often represented as something occurring at a 95th percentile. And in this case, because they had for pregnant women, age level greater than 1, at the 90th percentile and for children around the 95th percentile, they just reported that and concluded that that was enough evidence to provide support for their proposed rule. Well, did you have a point, last point, on that second thing that Judge Southwick asked you about? Not the 95 percent as a talisman, but on the reliability of the extrapolation from spot sample. Only one quick brief point, Your Honor, that the, on the spot sample point, the commission's point that the spot sampling can't represent individual exposures was a point as to those The spot sampling is actually effective at representing population level exposures over time. And that was the point that they were making in not being effective at the individual level. We ask that the court dismiss the petition for lack of standing. Thank you. Very briefly on standing, and then I'll try to very quickly touch on each of the three merits points. But on standing, this is really not complicated, especially with respect to DINP, because Exxon makes DINP. It sells DINP. It doesn't sell it directly to children's toy makers. It sells it to middlemen and distributors. And when a rule eliminates a particular market for that product, it decreases the demand, and that is standing. That is not controversial whatsoever. If you look at paragraph 8 in the supplemental declaration, it even talks about Exxon Mobil believing that its products do go to children and child care products. To answer your specific factual question, Judge Southwick, pragmatically DINP is the overwhelming market share here. It is the overwhelming market share with respect to What this case is really about is DINP. In terms of market share, absolutely. The other ones are important because the agency didn't follow the procedures, and as my friend on the other side admitted, those are not even found in commerce in children's products, many of them. On the first merits argument regarding the failure to follow the procedures for declaring banned hazardous products, I think the government's position is that that's simply stating the outcome of what happens when the commission passes this rule, that it's treated as a banned hazardous product. But Congress knows how to do that. In other sections of 2057, Congress said this rule shall be considered a ban on hazardous products. Congress did not say that here. It said the commission must declare these to be banned hazardous products. In doing that, it used the exact same language that is used in Section 2057 itself. 2057 itself says the commission must evaluate the rule and declare it a banned hazardous product. So it's a direct reference to a well-worn procedural and substantive set of requirements that the commission had to follow. I also point out that my friend asked for Chevron deference here, but you will search the rule for any construction or interpretation of the words declare these products a banned hazardous product. There are two points in the rule where the commission just declares we are not going to follow 2057 and 2058, but does not construe those words or explain the rationale that's been given this morning. So there could be no basis for deference. So that leaves us very much where this Court was in its August 2018 decision in Atkins v. Silverman, where an agency argued that it had to read out one particular provision in order to avoid conflicts, and this Court said no, you cannot read out a provision that Congress put in unless you show that it would be impossible to comply with both. The commission has not even attempted to make that showing. Even if there are individual conflicts with particular requirements under 2057, the rule of statutory construction would be that the Court should reconcile the two statutes in an attempt to give effect to Congress's intent. Turning to the more scientific argument about individuals versus population, I think the government was very candid in saying one woman is enough in the data set. And the problem, again, I think the Court is grasping this in its questions, is there's a disconnect between the spot sample-based HI, which the commission said, and I'll read the entire quote on 49.955. It said, HIs represent estimated population per capita phthalate exposure, not average daily estimates of an individual's exposure across time. So it's completely worthless data if you're just looking at actual women. If you can look and make some sort of population-wide inference, then it arguably could be valid data. And that's what the CHAP did when it looked at the 95th percentile. Mr. Street, let's say we don't accept your argument about this being procedurally defective in our procedure without cost-benefit analysis, et cetera. In looking at the standard in the new subpart, 2008 subpart, which talks about the certainty that no woman or child will be harmed, how can we say that the commission was wrong in saying that this data at least shows if these phthalates are out there, some women are going to be harmed, even if we're not sure of the number? Doesn't it at least support that? And is that either wrong factually or wrong legally about it being enough? So our argument is principally twofold. One, that the commission has to use logical and rational rulemaking. It can't say on the one hand we cannot use this data to make individual exposure estimates and then try to satisfy the statutory standard Your Honor asked about by looking at individual women. So it's a procedurally defective rule. But it's also sort of a do-over, though. We could send that back to the commission for them to say whatever they want to say about it. Absolutely. They'd have to make some sort of rational extrapolations from the data. But I think to the extent Your Honor is asking is there any evidence here that anybody is at risk, by the commission's own admission, they can't say that any individual is at risk. And from the individual spot sample data, the commission says spot samples are variable and not representative of long-term exposures. So they can't even say these women are at risk. And remember that the HI metric is very conservative and doesn't really even measure risk. And if I could very briefly touch on notice and comment, Your Honor. Could I take 30 seconds on that? Yes. Thank you. 30 seconds. Okay. The commission says there's no case where the agency is not allowed to shift the rationale so long as they keep the rule the same. The fact they completely changed the rationale doesn't matter. And that's absurd on its face. But BASF, which we cite at page 52, is on point. And, of course, the commission can't change its rationale. That's the whole basis for the rule. And they point out that Exxon Mobil did comment, trying to read between the lines of what the staff was saying, starting to look at the 99th percentile, but we did not have an opportunity to comment on looking at actual women. And that's where the conflict in the rationale really came in. So you only have the staff even saying this one thing, not the commission saying, Hey, we're looking at actual women now. And that deprived us of the opportunity to comment on that point. The Court will take a brief recess.